2006 UT App 446

LEWISTON STATE BANK, Plaintiff, Appellee, and Cross-appellant,

v.

GREENLINE EQUIPMENT, L.L.C., a Utah limited liability company; John Does I–X; and Jane Does I–X, Defendants, Appellants, and Cross-appellees.

No. 20050689–CA.

Court of Appeals of Utah.

Nov. 2, 2006.

Dennis L. Mangrum, Salt Lake City, for Appellants.

Brian G. Cannell, Hillyard Anderson & Olsen, Logan, for Appellee.

Before Judges GREENWOOD, BILLINGS, and THORNE.

## OPINION

GREENWOOD, Associate Presiding Judge:

¶1 Defendant Greenline Equipment, L.L.C. (Greenline) appeals the trial court's grant of summary judgment to Plaintiff Lewiston State Bank (the Bank). Greenline argues that it maintains a priority position in disputed collateral as the holder of a refinanced purchase-money security interest (PMSI). The Bank cross-appeals the trial court's failure to award it attorney fees and costs as consequential damages. We affirm.

## BACKGROUND

¶2 On March 5, 1998, Pali Brothers Farms (Pali Brothers) purchased two combines from Case Equipment. Pali Brothers financed its purchase under an agreement with New Holland Credit Company (New Holland) whereby New Holland obtained a PMSI in the combines. New Holland filed and perfected a financing statement on March 5, 1998.

¶3 On February 22, 2000, Pali Brothers executed a promissory note, borrowing $300,750 from the Bank. Pali Brothers granted the Bank a security interest in all "present and incoming equipment." The Bank filed and perfected a financing statement on February 25, 2000. On February 26, 2001, Pali Brothers executed a second promissory note, payable to the Bank, this time borrowing $275,687.50 and granting the Bank a security interest in "all farm equipment." The Bank filed and perfected a financing statement on May 8, 2001.

¶4 Subsequently, Pali Brothers defaulted on its payments to New Holland. On January 14, 2002, Greenline paid Pali Brothers's outstanding debt to New Holland in the amount of $67,654.79. In exchange, Greenline requested and received a lien release from New Holland on the two combines.

¶5 On February 20, 2002, Eli and Bart Pali executed a variable rate loan contract and security agreement with John Deere & Company (John Deere), which financed Eli and Bart Pali's purchase of the two combines from Greenline.[1] Eli and Bart Pali agreed to pay John Deere an origination charge of $150 and a finance charge of $10,626.43, as well as

---

1. Both brothers individually, rather than Pali Brothers Farms, were designated as and signed as buyers on the loan and security agreement.

$67,654.79 for the two combines. Repayment was deferred for one year. On March 6, 2002, John Deere filed and perfected a financing statement, designating the two combines as security for the loan.

¶ 6 Greenline contacted the Bank on March 25, 2002, to request subordination of the Bank's interest in the combines. The Bank did not agree to subordination. Pali Brothers defaulted on their payments to the Bank, and Eli and Bart Pali, as individuals, defaulted on their payments to John Deere. Thereafter, John Deere took possession of the two combines. Upon receiving a demand letter from the Bank that asserted its priority secured position in the equipment, John Deere assigned its interest in the equipment to Greenline. Greenline then sold the combines without notifying the Bank. On October 15, 2003, the Bank filed a complaint for disgorgement of the collateral or its proceeds, plus interest, costs, and attorney fees.

¶ 7 The parties filed cross-motions for summary judgment. The trial court denied Greenline's motion and granted the Bank's motion, ruling that Greenline's security interest in the combines was junior to the Bank's security interest as a matter of law. The court awarded damages to the Bank for $78,000 with ten percent per annum interest pursuant to Utah Code section 15–1–1(2). *See* Utah Code Ann. § 15–1–1(2) (2005). Additionally, the court denied the Bank's motion for summary judgment regarding attorney fees.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 Greenline appeals the trial court's grant of summary judgment and award of damages to the Bank. Greenline claims that the trial court erred in finding that the Bank held a priority security interest in the collateral. A trial court appropriately grants summary judgment when "there is no genuine

issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Whether the trial court properly granted summary judgment is a question of law that we review for correctness, according no deference to the trial court's legal conclusions." *Bakowski v. Mountain States Steel, Inc.,* 2002 UT 62, ¶ 14, 52 P.3d 1179 (citation omitted). We make this determination by viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* (quotations and citations omitted).

¶ 9 The Bank challenges the trial court's denial of its motion for summary judgment regarding attorney fees and costs. "The award of attorney fees is a matter of law, which we review for correctness." *Jensen v. Sawyers,* 2005 UT 81, ¶ 127, 130 P.3d 325 (citation omitted). However, "[a] finding of bad faith is a question of fact and is reviewed by this court under the 'clearly erroneous' standard." *Jeschke v. Willis,* 811 P.2d 202, 204 (Utah Ct.App.1991).

## ANALYSIS

### I. Purchase–Money Security Interest[2]

¶ 10 Greenline argues that it retained New Holland's original PMSI in the two combines after Pali Brothers refinanced its purchase-money obligation. Greenline relies, in part, on Utah Code section 70A–9a–103(6)(c), which states, "In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if the purchase-money obligation has been renewed, refinanced, consolidated, or restructured." Utah Code Ann. § 70A–9a–103(6)(c) (2001). Greenline maintains that Pali Brothers refinanced its obligation as established by the following circumstances:[3]

---

2. There are no disputed issues of material fact regarding the PMSI issue. We therefore consider only whether the trial court's decision was correct as a matter of law.

3. Greenline devotes a significant portion of its brief to arguing that the legislative intent underlying section 70A–9a–103(6)(c) was to ensure that purchase-money status survives refinancing un-

der the "dual status rule," rather than be transformed into non-preferred debt under the "transformation rule." U.C.C. § 9–103 cmt. 7(a); *see also* Utah Code Ann. § 70A–9a–103(6)(c) (2001). However, the Bank does not, nor do we, dispute this claim, and our analysis assumes validity of the dual status rule. *See* U.C.C. § 9–103 cmt. 7(a) (stating that the "dual status rule" is explicitly provided for in Uniform Commercial Code

To avoid default upon New Holland's purchase-money security interest, on February 20, 2002 the Pali Brothers as debtors negotiated a refinance of the outstanding balance of the original purchase-money debt, $67,654.79, with ... John Deere on behalf of Defendant Greenline. According to the terms of their refinance agreement, [Greenline] agreed to pay the outstanding balance owed to New Holland on the combines of $67,654.79, then refinance the same equipment for the same outstanding balance with the Pali Brothers.

¶ 11 Greenline asserts that in return for the refinance, Pali Brothers agreed to give Greenline "a [PMSI] in the combines in connection with this purchase and re[sale]." And because it purportedly retained the original PMSI in the collateral, Greenline concludes that it had priority over the Bank's security interest.[4] We disagree with Greenline's interpretation of these circumstances and conclude that the status of the original PMSI did not survive under section 70A–9a–103(6)(c) because Greenline, as a new creditor, satisfied and terminated the original purchase-money obligation, thereby extinguishing the PMSI. It was only after a span of time that Greenline extended new credit to Eli and Bart Pali in return for a security interest in the same collateral.

¶ 12 "[R]efinanced" is not defined in Utah's Article 9. Utah Code Ann. § 70A–9a–103.[5] When interpreting a statute, we "give effect to the legislative intent, as evidenced by the [statute's] plain language, in light of the purpose the statute was meant to achieve." *Summit Water Distribution Co. v. Summit County*, 2005 UT 73, ¶ 17, 123 P.3d 437 (alteration in original) (quotations and citations omitted). And we interpret a statute's plain language "in harmony with other statutes in the same chapter and related chapters." *Id.* (citation omitted). A well-settled principle of statutory construction is to rely on the plain meaning of a word or phrase unless it is ambiguous, *see id.* at ¶ 15, in which case "we look to legislative history and other policy considerations for guidance," *id.* at ¶ 17 (quotations and citation omitted).

¶ 13 Because the statute does not define "refinance"[6] and its application appears to depend on the actual facts of a transaction, we turn first to the goals and purposes of Article 9. The policies underlying Article 9 support our conclusion that the status of an original PMSI does not survive when a new creditor satisfies and terminates the original purchase-money obligation and subsequently extends new credit to the debtor for a security interest in the same collateral. Such a transaction contravenes " '[a] fundamental purpose of Article 9, [which] is to give notice to third persons and simplify the filing process.' " *J.R. Simplot Co. v. Sales King Int'l, Inc.*, 2000 UT 92, ¶ 14, 17 P.3d 1100 (footnote omitted) (quoting 9 Ronald A. Anderson & Lary Lawrence, *Anderson on the Uniform Commercial Code* § 401:5, at 43 (3d ed. rev. 1999)). In other words, the purpose of Article 9 is "to create commercial certainty and predictability by allowing [creditors] to rely on the specific perfection and priority rules

---

(U.C.C.) section 9–103(e) and "[f]or non-consumer-goods transactions, this Article rejects the 'transformation' rule").

**4.** The parties do not dispute the trial court's determination that New Holland had priority over the Bank's security interest under Utah's version of Article 9 of the U.C.C. *See* Utah Code Ann. §§ 70A–9a–101 to –709 (2001). In particular, Utah Code section 70A–9a–324 provides that "a perfected purchase-money security interest ... has priority over a conflicting security interest in the same goods." *Id.* § 70A–9a–324(1) (2001). In addition, "[i]f more than one security interest qualifies for priority in the same collateral," *id.* § 70A–9a–324(7), then pursuant to Utah Code section 70A–9a–322, "[c]onflicting perfected security interests ... rank according to priority in time of filing or perfection," *see id.* § 70A–9a–322(1)(a) (2001).

**5.** U.C.C. section 9–103(f), an identical counterpart to Utah Code section 70A–9a–103(6)(c), likewise does not define "refinance." *See* U.C.C. § 9–103(f)(3) (2005); U.C.C. § 9–103 cmt. 7(b).

**6.** "Refinancing" is defined in *Black's Law Dictionary* 1285 (7th ed.1999), as "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term by repaying the existing loan with money acquired from a new loan." We believe this definition is inadequate to establish a plain meaning for our purposes, as it does not address several relevant factors, such as the identity of the second loan creditor or the significance of secured transactions.

that govern collateral." *Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck & Co.,* 106 F.3d 227, 230–31 (8th Cir.1997) (alteration in original) (quotations and citation omitted).

¶ 14 In this case, the Bank received a security interest, junior to New Holland's PMSI, on February 22, 2000, and again on May 8, 2001. On January 14, 2002, in exchange for satisfying Pali Brothers's debt, Greenline requested and received from New Holland a lien release on the two combines, which thereby extinguished New Holland's PMSI. At this point, the Bank's perfected security interest became superior to any security interests perfected after May 8, 2001. *See* Utah Code Ann. §§ 70A–9a–324(7), – 322(1)(a). Over one month later, on February 20, Eli and Bart Pali granted John Deere a security interest in the combines. Therefore, the Bank's perfected security interest had priority over John Deere's later-acquired security interest. *See id.* §§ 70A–9a–324(7),–322(1)(a). If we held, instead, that John Deere retained New Holland's PMSI, then the Bank, when it executed its promissory notes and perfected its security interest, could not assume that it had priority once New Holland's PMSI was extinguished. Further, the state would have no recorded prior liens after New Holland's lien release. In addition, during the gap between January 14 and February 20, 2002, any potential creditors would have no notice of Greenline's PMSI and would enter into secured loan agreements under the false assumption of having a priority position.

¶ 15 Case law in other jurisdictions[7] further supports our conclusion that under section 70A–9a–103 and U.C.C. section 9–103, a PMSI does not ordinarily survive when a new creditor pays off a debtor's obligation to a prior PMSI lender. *See, e.g., In re Moody,*

97 B.R. 605, 607 (Bankr.D.Kan.1989) (holding that the status of a PMSI held by retailer was lost when the debtor refinanced her obligation with a third-party creditor); *In re Richardson,* 47 B.R. 113, 118 (Bankr. W.D.Wis.1985) ("[W]here a third party ... advances money to the debtor which is applied to the balance of the original note, the original lender is paid off and completely drops from the picture.... [T]he PMSI is extinguished.").

¶ 16 By contrast, our review of case law indicates that a PMSI may survive refinancing in only two circumstances: (1) when an original creditor, or (2) a creditor's assignee, refinances a debtor's obligation incurred to purchase the secured collateral. *See, e.g., In re Billings,* 838 F.2d 405, 410 (10th Cir.1988) (finding that refinancing a purchase-money loan by original creditor did not automatically extinguish PMSI where both parties intended for PMSI to continue); *In re Short,* 170 B.R. 128, 136 (Bankr.S.D.Ill.1994) (holding that PMSI survived consolidation of loan by original creditor, to extent of purchase money owed), *In re Schwartz,* 52 B.R. 314, 316 (Bankr.E.D.Pa.1985) (determining that after assignment of note and security interest to new creditor and refinancing by new creditor, PMSI was retained); *In re Conn,* 16 B.R. 454, 460 (Bankr.W.D.Ky.1982) ("We find the transfer [of a security interest in a refinance] from one pocket to another to be wholly permissible, so long as both pockets belong to the same creditor.").

¶ 17 Turning to the official comment after section 9–103,[8] we glean a similar understanding of the term "refinance."

> Whether [a refinance] encompass[es] a particular transaction depends upon whether, under the particular facts, the purchase-money character of the security

---

7. "Because the Uniform Commercial Code is national in character, case law interpreting it is also national. Consequently, where Utah's version of the U.C.C. is uniform, we rely on case law from other jurisdictions to interpret the Code." *Power Sys. & Controls v. Keith's Elec. Constr. Co.,* 765 P.2d 5, 10 n. 2 (Utah Ct.App.1988) (internal citation omitted).

8. Although the Utah legislature has not adopted the official comments to the U.C.C., they are

nonetheless persuasive authority. *See J.R. Simplot Co. v. Sales King Int'l,* 2000 UT 92, ¶ 40, 17 P.3d 1100; *see also Power Sys.,* 765 P.2d at 10 n. 3 ("[The official comments] are 'by far the most useful aids to interpretation and construction,' promoting reasonably uniform interpretation of the code by the courts." (quoting *Southern Util., Inc. v. Jerry Mandel Mach. Corp.,* 71 N.C.App. 188, 321 S.E.2d 508, 510 (1984))).

interest fairly can be said to survive. [The term refinanced] contemplates that an identifiable portion of the purchase-money obligation could be traced to the new obligation resulting from [the] . . . refinancing. U.C.C. § 9–103 cmt. 7(b).

¶ 18 In the present matter, contrary to Greenline's description of events, two distinct transactions occurred after New Holland's loan and security agreement with Pali Brothers. The first transaction occurred on January 14, 2002, when Greenline paid off Pali Brothers's outstanding debt to New Holland for the two combines. As a result of satisfying Pali Brothers's debt, New Holland gave Greenline a lien release on the two combines. Greenline's payment satisfied and terminated Pali Brothers's purchase-money obligation and thereby extinguished New Holland's priority PMSI. New Holland then dropped from the picture. New Holland did not assign its PMSI to Greenline when it exchanged the lien release for payment on the obligation.

¶ 19 The second transaction occurred over a month later when Eli and Bart Pali purchased the two combines from Greenline with financing from John Deere. John Deere and/or Greenline were both new creditors in this transaction because neither was involved in the security agreement between New Holland and Pali Brothers. There were two distinct transactions interrupted by a span of time when the only financing statements on file with the state were those of the Bank. Furthermore, as the trial court noted, there is nothing in the documents representing the transaction between Eli and Bart Pali on one hand, and John Deere and Greenline, on the other, reflecting an intent to continue the effectiveness of New Holland's PMSI. Indeed, the identity of the borrower changes from Pali Brothers, the company, to the Pali brothers, the individuals. Consequently, Pali Brothers did not refinance its purchase-money obligation to New Holland with John Deere or Greenline, as contemplated under section 70A–9a–103(6)(c). See Utah Code Ann. § 70A–9a–103(6)(c). On the contrary, New Holland's PMSI ended and over a month intervened before John Deere entered into a new security agreement with Eli and Bart Pali. Eli and Bart Pali merely obtained a new loan for a similar amount, secured by the same collateral.

## II. Attorney Fees and Costs

¶ 20 The Bank argues on appeal that the trial court erroneously failed to award attorney fees and costs as consequential damages. First, to the extent the Bank appeals the trial court's denial of its argument that Greenline failed to act in good faith because it "knowingly converted [the combines] after receiving notice of [the Bank's] priority lien rights," we find no abuse of discretion. Under Utah Code section 78–27–56, the trial court determined that there was no evidence that Greenline had intent or knowledge to defraud the Bank but instead reasonably believed it had a priority interest in the combines. See Utah Code Ann. § 78–27–56(1) (2002) ("[T]he court shall award reasonable attorney's fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith."). The trial court's findings are not clearly erroneous, and we accordingly affirm the ruling on this issue.

¶ 21 Next, the Bank contends that the trial court erroneously failed to consider its argument that it was entitled to an award of attorney fees and costs as consequential damages due to Greenline's failure to "reasonably foresee[ ] that [the Bank] would incur fees and costs in being forced to enforce its priority lien rights to disgorge the sale proceeds from [Greenline]." Under Utah law, attorney fees are generally not recoverable unless provided under statute or by contract. See Canyon Country Store v. Bracey, 781 P.2d 414, 419 (Utah 1989). Nonetheless, the Utah Supreme Court has allowed an award of attorney fees as consequential damages arising from a breach of contract, but only in limited contexts. See, e.g., Heslop v. Bank of Utah, 839 P.2d 828, 840–41 (Utah 1992) (involving employment contract); Pugh v. North Am. Warranty Servs., 2000 UT App 121, ¶ 21, 1 P.3d 570 (involving insurance contract); Zions First Nat'l Bank, N.A. v. National Am. Title Ins. Co., 749 P.2d 651, 657 (Utah 1988) (same); Canyon Country Store, 781 P.2d at 420 (same). This excep-

tion is inapplicable here because there is no contract between the Bank and Greenline.

¶ 22 Where a breach of contract has not occurred, the supreme court has allowed consequential damages only "when the natural consequence of one's negligence is another's involvement in a dispute with a third party," which is also known as the "third-party tort rule." *South Sanpitch Co. v. Pack,* 765 P.2d 1279, 1282–83 (Utah Ct.App.1988). The third-party tort rule is inapplicable because the Bank did not have to defend an action by anyone other than Greenline. *See Broadwater v. Old Republic Sur.,* 854 P.2d 527, 535 (Utah 1993) ("The rule only applies to the recovery of fees incurred in resolving third-party disputes caused by a defendant's negligence. It does not apply to fees incurred in recovering damages from that defendant."). Accordingly, we affirm the trial court's denial of attorney fees and costs to the Bank. Consequently, we also decline to award fees incurred on appeal.

## CONCLUSION

¶ 23 We acknowledge the policy considerations underlying Article 9 to promote notice and predictability in commercial transactions. A PMSI is extinguished upon satisfaction and termination of the purchase-money obligation, and the status of the original PMSI is not preserved unless the subsequent refinance is by the original creditor or its assignee, and even then, only to the extent all or part of the original purchase-money obligation remains owing. We note, however, that there may be other requirements, not relevant to this case. Accordingly, we affirm the trial court's grant of summary judgment to the Bank and the trial court's denial of Greenline's motion for summary judgment. We also affirm the trial court's denial of the Bank's motion for summary judgment regarding attorney fees and costs.

¶ 24 WE CONCUR: JUDITH M. BILLINGS and WILLIAM A. THORNE JR., Judges.